[No. E009237. Fourth Dist., Div. Two. Oct. 21, 1992.]

THE PEOPLE, Plaintiff and Respondent, v.
DANNY LYNN HARRIS, Defendant and Appellant.

674

## COUNSEL

Jonathan P. Milberg, under appointment by the Court of Appeal, for Defendant and Appellant.

Daniel E. Lungren, Attorney General, George Williamson, Chief Assistant Attorney General, Gary W. Schons, Assistant Attorney General, Keith I. Motley and Lilia E. Garcia, Deputy Attorneys General, for Plaintiff and Respondent.

## OPINION

TIMLIN, J.—Defendant appeals from the judgment entered upon his conviction by jury of one count of first degree burglary (Pen. Code, §§ 459/460), two counts of unlawful taking of a vehicle (Veh. Code, § 10851, subd. (a)) and one count of receiving stolen property (Pen. Code, § 496).[1]

On appeal, defendant has raised the following contentions: (1) The trial court committed "per se" reversible error by conducting a portion of the voir dire proceedings in its chambers and outside the presence of the public, thus

---

[1]Unless otherwise indicated, all statutory citations refer to the Penal Code.

violating defendant's constitutional right to a public trial; (2) there was insufficient evidence to support his conviction for receiving stolen property; (3) there was insufficient evidence to support his conviction on one of the counts of unlawful taking of a vehicle; (4) the trial court committed reversible instructional error by giving the "flight" instruction; (5) the trial court violated section 654 in sentencing defendant; and (6) the trial court improperly relied on several sentencing factors in imposing consecutive sentences on defendant. We shall conclude that defendant's first contention is meritorious and, consequently, that the judgment entered below must be reversed.[2] ▇▇▇▇ ▇▇▇ Given our conclusion as to defendant's first contention, there is no need to address defendant's other contentions on appeal.[3]

---

[2]After the appellate briefing in this case had been concluded, defendant sought, and received, leave from this court to file a supplemental letter brief on the issue of the trial court's asserted violation of his (defendant's) constitutional right to a public trial. We granted the People an opportunity to respond to defendant's letter brief. Defendant's supplemental letter brief, and the People's response thereto, addressed a recent opinion issued by the First District concerning a criminal defendant's constitutional right to a public trial, *People v. Woodward* (1992) 5 Cal.App.4th 114 [6 Cal.Rptr.2d 624]). Our Supreme Court granted review in *Woodward* on July 9, 1992 (S026586). Consequently, we have disregarded *Woodward*, as well as the parties' letter briefs concerning *Woodward*, in analyzing the issue of a criminal defendant's right to a public trial in this case.

[3]Although there is no need to address defendant's contention concerning the giving of the "flight" instruction in the specific context of this case, we do want to address it, if only briefly, in general terms. Because we find ourselves confronting this issue on a recurring basis, we want to disabuse defense counsel generally of the notion that the contention has merit.

CALJIC No. 2.52 states: "The flight of a person immediately after the commission of a crime, or after [he] [she] is accused of a crime, is not sufficient in itself to establish [his] [her] guilt, but is a fact which, if proved, may be considered by you in the light of all other proved facts in deciding the question of [his] [her] guilt or innocence. The weight to which such circumstance is entitled is a matter for the jury to determine."

Defendant argues that the giving of CALJIC No. 2.52 in this case favored the prosecution and constituted an improper "pinpoint" instruction contrary to the guidance of *People v. Wright* (1988) 45 Cal.3d 1126 [248 Cal.Rptr. 600, 755 P.2d 1049]. Defendant is in error.

In *Wright*, our Supreme Court held that it was improper to give requested instructions "that improperly impl[y] certain conclusions from specified evidence" because such instructions run afoul of "the well settled rule against argumentative instructions on a disputed question of fact." (45 Cal.3d at p. 1137.) CALJIC No. 2.52 is not the type of instruction to which *Wright* had reference:

(1) CALJIC No. 2.52, in and of itself, refers to no specific evidence. Indeed, the instruction acknowledges the possibility that the fact of a flight is a matter which the jury might find not to have been shown by the evidence.

(2) Apropos of the above, the trial court almost always also instructs the jury (as it did in this case) with CALJIC No. 17.31 (5th ed.), which states in part: "Whether some instructions apply will depend upon what you find to be the facts. Disregard any instruction which applies to facts determined by you not to exist."

No credible argument (apparent to us, at any rate) can be made that CALJIC No. 2.52, especially when given in conjunction with CALJIC No. 17.31, constitutes a "pinpoint"

FACTS

Given the singular ground upon which we have determined to reverse the judgment entered below, there is no need for a lengthy and seamless rendition of the facts underlying the charges brought against defendant. It suffices to note that defendant, together with a female companion (Portillo), was charged with various counts of burglary and unlawfully taking a vehicle—which counts referred to events occurring on two distinctly different occasions. Defendant pled not guilty to all counts.

Jury trial as to both defendant and codefendant Portillo thereafter commenced. At the very beginning of the jury selection proceedings, and outside the presence of the venirepersons, the trial judge proposed a particular procedure for selecting the jury—which procedure was new to counsel and is best explained by simply setting forth the following somewhat condensed and edited version of exchanges which took place between the trial judge and counsel:

"THE COURT:   Back on the record. My proposal is, counsel, that I'll voir dire on all—in all areas and I'll receive, as I have Mrs. McGuire's [Portillo's counsel], all your concerns and questions you wish to ask I'll address to the jury for you. I will also give you each ten minutes with the panel beyond my extensive voir dire.

"MR. LEVINE [counsel for defendant]:   And by 'the panel,' the Court means the—

"THE COURT.   The first 20, right.

"MR. LEVINE:   I didn't count. There's gonna be 20 people sitting up there?

"THE COURT:   A total of 20, right.

"MR. LEVINE:   So we would have ten minutes each, for a total of 30 minutes, since there's three counsel?

"THE COURT:   Right.

"MR. LEVINE:   To question the first 20 people?

"THE COURT:   Right.

---

"argumentative instruction on a disputed question of fact." (We word our conclusion in this fashion out of appreciation for the fact that "wisdom never says 'never.' ")

"MR. LEVINE: And then if we have preempts [*sic*] or for cause, what about the individual jurors that come up there?

"THE COURT: We'll do a chambers striking, as I suggested to you, and then if we have to have additional jurors beyond that, we'll discuss how much time is appropriate.

"MR. HARRISON [prosecutor]: The chambers striking, I'm uncertain what the Court intends on that.

"MR. LEVINE: Are we going to wait until all of them are questioned?

"THE COURT: All questioned and all the for cause [challenges] passed.

"MR. LEVINE: Then we'll go inside and exercise peremptories back and forth with the people seated?

"THE COURT: Filling the chairs of those—

"MR. LEVINE: On this side of the box?

"THE COURT: If you exercise a perempt on chair one, we'll fill it with—

"MR. LEVINE: Chair 14?

"THE COURT: Shall we have two alternates in this case? I think one will be enough. So we'll fill it with chair 14, right. And then so we'll have a jury of 13 eventually impaneled, but we'll fill chair one with chair 13 [*sic*], then we'll go on the [*sic*] to the other side and then we'll fill—

"MR. HARRISON: You just go through the in-chambers striking, peremptory striking, one time, and subsequent excusals—

"THE COURT: My hope is that we'll have a jury as a result of that. If we don't, we'll do that striking, then fill the additional chairs, those seven chairs with an additional seven and qualify them and then go through a similar striking process.

"MR. HARRISON: Out of the presence of the jury?

"THE COURT: Right.

"MR. HARRISON: I'm not sure if I want to do it that way.

"THE COURT: Well, I do. And then I'll come out and announce who's to leave the box and who's to replace who.

"MR. HARRISON:   I think we have the right to do our jury selection in the open court room in front of the jury. I understand the desire of moving it along speedily and that sort of thing, but at the same time, I think the panel has a right to know who's excused by whom.

"THE COURT:   Well, we'll do it my way, counsel. Thank you.

".   .   .   .   .   .   .   .   .   .   .   .   .   .   .   .   .   .   .   .   .   .   .   .   .   .

"MR. HARRISON:   I want to make a record on the jury selection process, specifically on 13259 of the pamphlet given to the Court, the second column, the fourth paragraph, 'while concluding.'

"THE COURT:   That's interesting and it's informative. I'll be happy to select 12 and not 13.

".   .   .   .   .   .   .   .   .   .   .   .   .   .   .   .   .   .   .   .   .   .   .   .   .

"THE COURT:   It admonishes us to consider a jury of 12 as opposed to 14, . . .

"MR. HARRISON:   There's one other issue that needs to be addressed.

".   .   .   .   .   .   .   .   .   .   .   .   .   .   .   .   .   .   .   .   .   .   .   .   .

"MR. HARRISON:   In addition, the peremptory challenge outside the jury, let me cite to the Court the Press Enterprise Company versus Superior Court, a 1984 case, U.S. Supreme Court, 464 U.S. 501 [78 L.Ed.2d 629, 104 S.Ct. 819], for the proposition that the voir dire process is a public process. The public has right to be here. The People and the defense and the public have a right to a public trial, and the exercise of peremptory challenges in chambers, sequestered away from the public area, the jury itself, violates that public process.

"MR. LEVINE:   I think the public just spoke and told us that voir dire is something the public doesn't want.

"THE COURT:   I am, I acknowledge to you, experimenting with these procedures to expedite the jury selection, and I think the process that I used previously in the Kolstead case, which I suggest to you now is one that is—does not violate any basic right of anyone, indeed it can be argued, perhaps persuasively, that it's an even better process because nobody is prejudiced by the exercise of peremptory challenges in this manner. [¶] There's always a tendency, when those are exercised in front of the jury, to

suggest, by the number exercised or not exercised, that one party is more blameless than the other in that challenging process. So I think that this may be—this more sanitized method of selection may be preferred.

"MR. HARRISON: It may be preferred, but it's contrary to Statute 226 of the Civil Code of Procedure—

"THE COURT: I just read 226, and it doesn't say a thing about that. Point to me what my proposed process abridges in 226.

"MR. HARRISON: Challenges shall be taken first by the defendants and then by the People. Peremptory challenge, under 231, prescribes the method of peremptory challenge.

"THE COURT: That's the way we'll do it, taking first by the defense, then by the People, in the striking manner that I've suggested.

"MR. HARRISON: If we're going to do it one at a time, it does nothing to speed the the [sic] jury selection process.

"THE COURT: Well, it sure does.

"MR. HARRISON: Are you requiring me to make all of my peremptory challenges out of the first batch at the very beginning of the selection process?

"THE COURT: No. We'll do it just as we would do it here except we'll do it in the privacy of chambers, moving through those that have been qualified and passed on for cause. We'll move through that panel first, and it may be that you're satisfied with the number that you have within that panel. And if you're not, we'll bring another group forward.

"      .   .   .   .   .   .   .   .   .   .   .   .   .   .   .   .   .   .   .   .   .   .   .

"THE COURT: Are you understanding what I'm—

"MR. HARRISON: No, I don't, not at all. This is very burdensome.

"THE COURT: All right. We'll qualify all 20, then we'll each retreat to chambers. I'll ask the People for their exercise of their first peremptory, and then we'll move juror number 13 into that first challenged chair. And then we'll move to the defendants jointly—they have ten jointly—and they'll exercise their perempt. Then chair number 14 will occupy that seat. [¶] We'll go back to the prosecution to exercise their second perempt, and if you

exercise a perempt at that point, we'll move the 15th juror into that chair. [¶]
Do you follow me? Back and forth, just like we would do out here—

"MR. HARRISON:   Up to the point I've exercised 20?

"THE COURT:  · Up to the point where we've basically exhausted this
panel, if we reach that point and you're not happy with the jury.

"MR. HARRISON:   This is unduly lengthening the process. I've selected
juries in this courtroom before and as the Court is aware, I do not spend a
whole lot of time on the individuals.

"THE COURT:   I thought we would try this, folks. I've found it—other
judges in the state with whom I've discussed this found it to be expeditious.
I found it, in the one case where I tried it, to be remarkably expeditious. We
chose a Murder One jury in the first 20.

"MR. HARRISON:   If I were inclined to go back and exercise my objection
to three or four people all at one time—

"THE COURT:   It wouldn't be at one time. We'd just go back and forth, as
we do out here, basically, until we've exhausted that panel.

"MS. MCGUIRE:   It would be all at one sitting?

"THE COURT:   It would be very quick. Instead of having people move
back and forth and further examination by the Court and counsel, that's
where you save that time. The block of time is saved in the movement of
people and in further questioning by all of us.

"MR. HARRISON:   I think it's going to result in a lengthening of the
process, but that's your prerogative.

".  .  .  .  .  .  .  .  .  .  .  .  .  .  .  .  .  .  .  .  .  .  .  .  .  .  .  .  .  .

"THE COURT:   So, we'll give it a shot this time and see how it flies.

"MR. HARRISON:   Has the Court addressed the public nature of the trial
issue that I brought up, The Press Enterprise Case versus Superior Court?

"THE COURT:   I don't see that this violates any public trial provisions,
and it will be interesting, if that is your objection, or is that the objection by
the defense?

"MR. LEVINE:   I might as well join.

"THE COURT: Okay. Well, we have armed the defense with a new possibility for reversal. That's fine. We'll go with it."

The trial court thereafter conducted the voir dire proceedings in accordance with the procedure set forth above, to wit:

(1) Once the trial counsel had "passed for cause" on a panel of 20 prospective jurors, the trial court addressed the prospective jurors as follows:

"THE COURT: All right. Members of the jury, all three attorneys have passed for cause, which means none of the attorneys have any legal cause why any among you should be excused from the panel. [¶] I'm going to, however, recess with them now and discuss with them their peremptory challenges. The law provides that each attorney comes equipped with a number of challenges that can be made without cause given. The reasons for those challenges are best known to the attorney who makes the challenge and may be apparent to no one else. [¶] What I'm saying is if you're asked, when we return to the courtroom, to step from the box because of one of these challenges, please don't feel put down. Don't feel embarrassed by it. It happens to the very best among us, I can assure you. [¶] If you'll relax right there just for a few minutes, we'll return and we'll have further instructions for you on these peremptory challenges. Just relax in your chairs, if you will. [¶] Counsel, will you join me, please. [¶] (The following proceedings were held in chambers, out of the presence and hearing of the prospective jurors.)"

(2) In chambers, trial counsel proceeded to exercise their peremptory challenges in an alternating fashion.[4]

(3) Once trial counsel had exercised a total of eight peremptory challenges (leaving twelve prospective jurors "in the box"), the trial judge and trial counsel returned to the courtroom and the trial judge made the following announcement:

"THE COURT: All right. The Court is going to thank and excuse the following persons now before the bar, with the Court's thanks for your being here today and being part of this important jurisprudence process: [¶] We'll thank and excuse Gene Trudo, Linda Herbel, Merriana Nunez, Ann Trunnelle, Vicki Munden, John Conway, Ronald McPherson and Ben Wolff. [¶] You can all now absent yourself from the box and you are free to go."

---

[4]These challenges were "tracked" by the trial judge and trial counsel on paper. As each side exercised a peremptory challenge against one of the twelve prospective jurors already tentatively "in the box," the trial judge would "scratch" the name of the challenged prospective juror and substitute in lieu thereof the name of one of the supplemental prospective jurors who had already been "passed for cause."

(4) The entire process was repeated a second time. After another "sub-panel" of prospective jurors had been "passed for cause," the trial judge and trial counsel retreated once again to chambers and trial counsel once again exercised peremptory challenges in the same alternating fashion. Upon returning to the courtroom, the trial judge announced:

"The attorneys have asked me to thank and excuse the following members of the panel now in the box and before the box: We'll thank and excuse Lucinda Rodriguez. . . . Leamon Alexander. . . . Renato Urmanita, . . . Marceline Lucero, . . . Otis Jordan, . . . Bill Lawrence, . . . Cezar Rodriguez, . . . Judy Schiffer, . . . Margaret Goss, . . ."

(5) Inasmuch as the general consensus of trial counsel was that only one trial juror and one alternate juror remained to be chosen, the trial judge and trial counsel thereafter conducted the remainder of the voir dire and the exercise of the remainder of the peremptory challenges in open court.

Thus, a total of 17 prospective jurors were peremptorily challenged in chambers.

The case was thereafter tried to the jury. Following the evidentiary phase of the trial, the jury found defendant guilty of one count of first degree (residential) burglary, two counts of an unlawful taking of a vehicle and one count of receiving stolen property as a lesser related offense of burglary.

At the sentencing hearing, the trial court imposed the midterm of four years for the conviction on the first degree burglary count, consecutive terms of one year each for the two unlawful taking of a vehicle counts and a consecutive term of eight months for the receiving stolen property count—for an aggregate sentence of six years and eight months in state prison.

Additional facts will be referred to, as needed, in the discussion which follows.

### DISCUSSION

Defendant contends that the trial court's "chamber striking" procedure for conducting the peremptory challenge process violated his constitutional right to a public trial. The constitutional provisions to which defendant has reference are:

(1) Under the United States Constitution—(a) the Sixth Amendment ("In all criminal prosecutions, the accused shall enjoy the right to a speedy and

public trial, . . .") and (b) the Fourteenth Amendment (". . . ; nor shall any State deprive any person of life, liberty, or property, without due process of law; . . ."). (See *Waller* v. *Georgia* (1984) 467 U.S. 39, 41 [81 L.Ed.2d 31, 35, 104 S.Ct. 2210].)

(2) Under the California Constitution—article I, section 15, clause 1 ("The defendant in a criminal cause has the right to a speedy public trial, . . ."). (see *People* v. *Pompa-Ortiz* (1980) 27 Cal.3d 519, 525 [165 Cal.Rptr. 851, 612 P.2d 941].)[5]

There seems little doubt in this case but that the exercise of peremptory challenges was not conducted "in public."[6] There remains, then, only to inquire as to:

(A) Whether the peremptory challenge process is a part of the "trial" to which a criminal defendant's right to a public trial extends—and, if so, then—

(B) Whether there are any limiting exceptions or qualifications to a criminal defendant's right to a public trial which would apply in this case—and, if not, then—

(C) Whether defendant has waived his right in this case to raise an appellate challenge to the trial court's "chamber striking" procedure—and, if not, then—

(D) What the appropriate remedy is for a violation of a criminal defendant's right to a public trial.

---

[5] A California criminal defendant also enjoys a statutory right to a public trial. (§ 686, subd. 1; see *People* v. *Thompson* (1990) 50 Cal.3d 134, 157, fn. 7 [266 Cal.Rptr. 309, 785 P.2d 857].) Given the superior authority of constitutional law, this statutory provision has no particular bearing on our analysis.

[6] In their respondent's brief, the People argue that "the actual peremptory challenges were made and announced in open court in the presence of the jury." Frankly, we are somewhat at a loss to understand how the People can hold to this position when the record on appeal (in particular, the augmented supplemental reporter's transcript) is so clearly to the contrary. The *net result* of the peremptory challenges may have been (and were) *announced* in open court—but the peremptory challenges themselves were actually "made" (exercised) in chambers. Thus, *none* of the following was ever made public:

(a) Which party exercised which peremptory challenge;

(b) The order in which the peremptory challenges were made; and

(c) The order in which supplemental prospective jurors were "moved forward" to take the place of the prospective jurors who had been peremptorily challenged.

In short, the trial court's "chamber striking" methodology kept private the sequence of events related to the exercise of peremptory challenges through which the eventual constituency of the jury "unfolded."

A. *The Peremptory Challenge Process as a Part of the "Trial" to Which Defendant's Public Trial Rights Extend.*

Both state and federal case authority indisputably support the position that the peremptory challenge process is a part of the "trial" to which a criminal defendant's constitutional right to a public trial extends.

Our Supreme Court has explicitly stated that: "A defendant has both a constitutional and a statutory right to public trial. [Citations.] *Proceedings for the impanelment of the jury are included within the term 'public trial.'* (*People* v. *Teitelbaum* (1958) 163 Cal.App.2d 184, 206 [329 P.2d 157].)" (*People* v. *Thompson, supra,* 50 Cal.3d 134, 157, fn. 7, italics added.)

Federal authority is to the same effect. In *Press-Enterprise Co.* v. *Superior Court* (1984) 464 U.S. 501 [78 L.Ed.2d 629, 104 S.Ct. 819], the United States Supreme Court held that "the voir dire process must be open" (464 U.S. at p. 509, fn. 8 [78 L.Ed.2d at p. 638]) to the public and the press on First Amendment grounds. In *Waller* v. *Georgia, supra,* the United States Supreme Court stated that "there can be little doubt that the explicit Sixth Amendment right of the accused is no less protective of a public trial than the implicit First Amendment right of the press and public." (467 U.S. at p. 46 [81 L.Ed.2d at p. 38].)

The peremptory challenge process, precisely because it is an integral part of the voir dire/jury impanelment process, is a part of the "trial" to which a criminal defendant's constitutional right to a public trial extends. Thus, in this case, the trial court's "chamber striking" method of conducting a portion of the peremptory challenge process was at least a prima facie violation of defendant's constitutional right to a public trial.

In reaching this conclusion, we reject two arguments to the contrary:

(1) It cannot reasonably be argued that the presence of a certified court reporter during the in camera peremptory challenge proceedings (recording verbatim the verbal statements of all who are present), and the resultant after-the-fact availability of transcripts of the reporter's notes of those proceedings, render those proceedings "public."[7] In *Waller* v. *Georgia, supra,* the United States Supreme Court noted that: "The requirement of a public trial is for the benefit of the accused; that the public may see he is fairly dealt with and not unjustly condemned, and that the presence of interested spectators may keep his triers keenly alive to a sense of their responsibility

---

[7]We do note that both defendants and their counsel were present in the trial court's chambers during the "chamber striking" peremptory challenge process.

and to the importance of their functions . . . ." (467 U.S. at p. 46 [81 L.Ed.2d at p. 38], citations, internal quotation marks and fn. omitted.) This benefit of public oversight or superintendence accruing to a criminal defendant as a result of the openness inherent in a truly public trial is largely lost if the only openness attending the trial proceedings (or any portion thereof) is to be found in an after-the-fact review of a cold written record of proceedings to which the public had no access.

(2) Nor can it reasonably be argued that the "chamber striking" methodology used by the trial court in this case is no more a violation of a criminal defendant's constitutional right to a public trial than the commonly accepted procedure of holding "side bar conferences" (i.e., conferences between court and counsel, either at the trial judge's bench or elsewhere but, in any event, outside the hearing of other persons present in open court). ■ It has long been recognized that "[t]he trial of the action, so far as the term 'public trial' is concerned, consists in the proceedings for the impanelment of the jury, the opening statements of counsel, the presentation of evidence, the arguments, the instructions to the jury and the return of the verdict," but does not include conferences between court and counsel where "the subject matter of the conferences between court and counsel was a question or questions of law, and not matters advanced for consideration of the triers of fact." (*People* v. *Teitelbaum* (1958) 163 Cal.App.2d 184, 206-207 [329 P.2d 157], see also *People* v. *Murphy* (1973) 35 Cal.App.3d 905, 925-926 [111 Cal.Rptr. 295].)

B. *Limiting Exceptions or Qualifications to a Criminal Defendant's Right to a Public Trial.*

In *Waller* v. *Georgia, supra,* the United States Supreme Court announced a limitation/qualification on and to a criminal defendant's constitutional right to a public trial, a limitation/qualification which the Supreme Court "imported" from *Press-Enterprise Co.* v. *Superior Court, supra*:

■ "[T]he Court has made clear that the right to an open trial may give way in certain cases to other rights or interests, such as the defendant's right to a fair trial or the government's interest in inhibiting disclosure of sensitive information. Such circumstances will be rare, however, and the balance of interests must be struck with special care. We stated the applicable rules in Press-Enterprise: [¶] 'The presumption of openness may be overcome only by an overriding interest based on findings that closure is essential to preserve higher values and is narrowly tailored to serve that interest. The interest is to be articulated along with findings specific enough that a

reviewing court can determine whether the closure order was properly entered.' 464 US, at 510 . . . ." (467 U.S. at p. 45 [81 L.Ed.2d at p. 38].)[8]

■ In this case, the trial court did articulate the "interests" sought to be served by utilizing the "chamber striking" method of conducting the peremptory challenge process: (1) "[T]o expedite jury selection"; and (2) to avoid, by using a "more sanitized method of selection," a trial counsel's being prejudicially disfavored by a juror or jurors as a result of that counsel's exercise of peremptory challenges. However, even if we were to assume arguendo that there is empirical evidence to support the trial court's proposition that the "chamber striking" method of conducting peremptory challenge proceedings effectively serves the interests of expediting and "sanitizing" those proceedings, no cogent argument can be mounted that either of these interests involves "higher values" than that of a criminal defendant's constitutional right to a public trial. Thus, the trial court's closure of the peremptory challenge process to public view was not justified under the "Press-Enterprise/Waller balancing test."[9]

C.  *Preservation of the "Public Trial Issue" for Appellate Review.*

At oral argument, the People contended for the first time that defendant had failed to preserve this issue for appellate review. ■ It is a clearly understood principle of appellate review, so well established as to need no citation to authority, that contentions raised for the first time at oral argument are disfavored and may be rejected solely on the ground of their untimeliness. ■ However, given the constitutional importance of the issue here in question, we will address the People's argument to the limited extent needed to disclose its lack of merit.

The People argue that the prosecuting attorney objected to the trial court's proposed "chamber striking" method of conducting the peremptory challenge process only on the ground of the press/public's *First Amendment* right

---

[8]Stated alternatively: "Under Press-Enterprise, the party seeking to close the hearing must advance an overriding interest that is likely to be prejudiced, the closure must be no broader than necessary to protect that interest, the trial court must consider reasonable alternatives to closing the proceedings, and it must make findings adequate to support the closure." (467 U.S. at p. 48 [81 L.Ed.2d at p. 39].)

[9]The California Supreme Court has itself announced a similar "closure standard": "Furthermore, the trial court has discretion to close portions of the trial to the public, even without consent of or waiver by defendant, when there is good cause for such action based upon justice or protection of the parties. [Citation.]" (*People* v. *Cash* (1959) 52 Cal.2d 841, 846. [345 P.2d 462].) We view the California "closure standard" of "good cause based on justice or protection" to be nothing more than an alternate expression of the *Press-Enterprise/Waller* "closure standard" of "overriding interest based on higher values"—an alternate expression which must be interpreted in light of, and applied in accord with, the *Press-Enterprise/Waller* guidelines for implementing a closure order.

to a public trial, and not on the ground of a criminal defendant's *Sixth Amendment* right to a public trial—and, thus, when defendant's counsel joined in the prosecuting attorney's objection to the "chamber striking" procedure he (defense counsel) was *not* asserting his client's individual right to a public trial. From this, the People go on to argue that defendant, by failing to object to the "chamber striking" procedure on Sixth Amendment grounds in the trial court, waived his right to make that argument on appeal. In making this waiver argument, the People rely on two recent opinions by our Supreme Court: (a) *People* v. *Thompson, supra,* 50 Cal.3d 134, at page 157 ("It is well settled that [the right of a criminal defendant to a public trial] may be waived by the failure to assert it in timely fashion. [Citations.]"); and (b) *People* v. *Edwards* (1991) 54 Cal.3d 787, at page 813 [1 Cal.Rptr.2d 696, 819 P.2d 436] ("A defendant 'may, by his own acts or acquiescence, waive *his right* [to a public trial] and thereby preclude any subsequent challenge by him of an order excluding the public.'. . . [Citations.]") The People's argument is fundamentally flawed in two respects:

(1) The Supreme Court authorities relied on by the People address factual scenarios which differ materially from the factual scenario presented by the instant case. In *Thompson,* defense counsel did not object (either explicitly or implicitly) to the "sequestered voir dire" procedure utilized by the trial court in that case. In *Edwards,* defense counsel specifically objected to *allowing* certain portions of the voir dire proceedings to be conducted in public. In neither case did defense counsel make a specific objection, such as the one which was made in this case by defendant's counsel (by way of joinder in the prosecuting attorney's objection), to the "closing" of portions of the jury selection process. The facts extant in *Thompson* and *Edwards* made the application of a "waiver of argument on appeal" doctrine appropriate in those cases—but no such facts exist in this case.

(2) The record on appeal in this case does not convincingly support the People's assertion that only a First Amendment objection was made to the trial court's proposed "chamber striking" procedure. The prosecuting attorney specifically pointed out to the trial court that "[t]he People *and* the defense *and* the public have a right to a public trial." (Italics added.) In the same vein, the trial court stated that "I don't see that this violates *any* public trial provisions, . . ." (Italics added.) While it is true that the only specific authority cited by the prosecuting attorney in support of his objection was *Press-Enterprise Co.* v. *Superior Court, supra,* 464 U.S. 501 (which opinion concerned the press/public's First Amendment right to a public trial), we do not find that that fact, alone, is determinative of the issue. The record is ambiguous. Given the fact that defense counsel made a specific objection to the precise judicial procedure in question, we are not inclined to find a

waiver of a fundamental constitutional right based on suppositions, specula-
tion and conjectural inferences drawn from a strained reading of the record.

### D. *The Appropriate Remedy.*

Defendant has made no showing—indeed, has not attempted to show—
that he was actually prejudiced by the "chamber striking" method of con-
ducting the peremptory challenge proceedings in this case. However, defend-
ant argues, correctly, that a violation of a criminal defendant's constitutional
right to a public trial constitutes "per se" reversible error.

Case authority is virtually unanimous to the effect that a violation of a
criminal defendant's constitutional right to a public trial constitutes "per se"
reversible error:[10]

(a) In *Waller* v. *Georgia, supra,* the United States Supreme Court agreed
with "the consistent view of the lower federal courts that the defendant
should not be required to prove specific prejudice in order to obtain relief for
a violation of the public-trial guarantee." (467 U.S. at p. 49 [81 L.Ed.2d at p.
40], fn. omitted.)

(b) Just this last year, in *Arizona* v. *Fulminante* (1991) 499 U.S. __ [113
L.Ed.2d 302, 111 S.Ct. 1246], the United States Supreme Court reaffirmed
the position it had taken on this issue in *Waller*: "Since our decision in
Chapman [v. California (1967) 386 U.S. 18 (17 L.Ed.2d 705, 87 S.Ct. 824)],
other cases have added to the category of constitutional errors which are not
subject to harmless error the following: . . . the right to public trial, Waller
v. Georgia, 467 US 39, 49, n 9, 81 L Ed 2d 31, 104 S Ct 2210 (1984). Each
of these constitutional deprivations is a similar structural defect affecting the
framework within which the trial proceeds, rather than simply an error in the
trial process itself." (499 U.S. at p. __ [113 L.Ed.2d at p. 331].)[11]

(c) California authority is to like effect. (*People* v. *Byrnes* (1948) 84
Cal.App.2d 72, 78-80 [190 P.2d 290], expressly approved in *People* v.
*Pompa-Ortiz, supra,* 27 Cal.3d at p. 527.)

---

[10]The People rely on *People* v. *Wright* (1990) 52 Cal.3d 367, 395-398 [276 Cal.Rptr. 731,
802 P.2d 221], as authority for their position that the error here in issue should be addressed
by way of a harmless error analysis. The People's reliance is misplaced. *Wright* has nothing to
say about a criminal defendant's constitutional right to a public trial. Rather, *Wright* (insofar
as it is relied on by the People) is concerned solely with a trial court's deviation from a
statutorily described jury selection process—a deviation which did not impinge on the
"publicness" of the proceedings.

[11]In *Fulminante,* the Supreme Court described these "per se" constitutional errors as
"structural defects in the constitution of the trial mechanism, which defy analysis by 'harm-
less error' standards." (499 U.S. at p. __ [113 L.Ed.2d at p. 331].)

## CONCLUSION

We do not lightly reverse criminal convictions in the total absence of any showing of specific prejudice or harm to the defendant flowing from the proceedings had below. In short, we are loath to "exalt form over function." Further, we are sympathetic and sensitive to the needs and desires of the trial bench to find new and creative ways to make the trial process more efficient and streamlined; indeed, we would be remiss if we were not to *encourage* the trial bench, at every reasonable opportunity, to be creative and innovative in finding ways to increase the efficiency of the public trial process. In this case, however—notwithstanding the lack of any showing of prejudice or harm to the defendant, and irrespective of the trial bench's need for efficiency—we are constrained to conclude that the "chamber striking" procedure adopted and applied by the trial court in this case to direct and manage the exercise of peremptory challenges violated defendant's constitutional right to a public trial. Consequently, the implementation of that procedure constitutes "per se" reversible error.

## DISPOSITION

The judgment entered below is reversed.

Hollenhorst, Acting P. J., and McDaniel, J.,* concurred.

Respondent's petition for review by the Supreme Court was denied February 2, 1993. Panelli, J., and Kennard, J., were of the opinion that the petition should be granted.

---

*Retired Associate Justice of the Court of Appeal, Fourth District, senior judge status (Gov. Code, § 75028.1), sitting under assignment by the Chairperson of the Judicial Council.