Filed 5/17/13  In re Tom E. Dixson Trust CA4/1

## NOT TO BE PUBLISHED IN OFFICIAL REPORTS

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

COURT OF APPEAL, FOURTH APPELLATE DISTRICT

DIVISION ONE

STATE OF CALIFORNIA

| | |
|---|---|
| In re TOM E. DIXSON TRUST. | |
| JULIE ANN DUEPNER-DIXSON,<br><br>Petitioner and Appellant,<br><br>v.<br><br>HARLEY M. DIXSON, et al,<br><br>Objectors and Respondents. | D062439<br><br>(Super. Ct. No. 37-2010-00150222-PR-TR-NC) |

APPEAL from orders of the Superior Court of San Diego County, Richard G. Cline, Judge.  Affirmed.

Susan Stricklin Wilson and Barbara K. Meserve for Petitioner and Appellant.

Procopio, Cory, Hargreaves & Savitch and Mary V.J. Cataldo for Objectors and Respondents.

Petitioner and appellant Julie Duepner-Dixson (Julie), was married to Tom E. Dixson (Tom), although they had separated and he had filed a petition for dissolution of their marriage before he died by his own hand in 2009.  Tom's property was disposed of by a will and trust, whose trustees, Harley M. Dixson and Rosella Jean Pelzer, are the

objectors and respondents on appeal (the trustees), concerning Julie's petition to share in Tom's estate as an omitted spouse pursuant to Probate Code[1] section 21600 et seq. Julie appeals orders that deny her standing to pursue such claims and that settle the trustees' account and report, and allow them compensation and fees.

Julie contends the evidence that was presented at bifurcated trial proceedings, concerning her standing as a pretermitted spouse, was insufficient to support the probate court's order denying her such standing and disallowing her objections to the trustees' administration. She claims the trial court erred by ruling (A) she did not qualify under section 78, subdivision (d) as a surviving spouse who retained inheritance rights; (B) certain payments made to her by Tom were intended by him to amount to a transfer to her "in lieu" of any recovery through his estate plan, within the meaning of section 21611, subdivision (b); and (C), she effectively agreed to waive all her inheritance rights within the meaning of section 140 et seq., and section 21611, subdivision (c).

We have examined Julie's arguments in light of the record and determine that the probate court's rulings are well supported by the evidence and the law, and must be affirmed.

FACTUAL AND PROCEDURAL BACKGROUND

A. Marriage; Tom's Estate Planning Documents; Separation

Julie and Tom were each mature businesspersons when they married in June 2008, and Julie was Tom's sixth wife. In 1986, Tom executed a living trust, and he amended it seven times. The Trustees are Tom's brother and sister, Harley M. Dixson and Rosella

---

[1]    All statutory references are to the Probate Code unless otherwise specified.

Jean Pelzer. Generally, Tom's will provided that his assets would be poured over into the Trust and allocated among his three children, one from a former marriage, and two with his fifth wife, Christie Lange (Lange). Tom and Julie had no children from their marriage.

Tom had psychiatric problems, including a bipolar condition, and he and Julie quarreled and separated in March 2009. Tom's business was in financial trouble and he wanted to get a loan against the marital residence to raise cash. Attorneys for Tom (Christine Sickler) and Julie (John Anderson) negotiated a property settlement, and on March 13, 2009, each party signed a memorandum of settlement (the memorandum). Julie agreed to execute an interspousal grant deed (the deed) for her interest in the residence, upon the receipt of a $40,000 payment from Tom and a debt forgiveness of $8,200 on credit cards (mainly for her attorney fees in preparing for dissolution). The deed was signed and the payments made, although the parties dispute whether the payments were in the nature of support, a divorce property settlement and/or an inheritance settlement.

The terms of the memorandum anticipated that an executed marital settlement agreement (MSA) would follow, and it would include the standard "certified specialist" provisions, such as inheritance waivers. The memorandum provided that Julie waived "any and all rights she may have to receive" spousal support, community property interests, or any of Tom's retirement assets. It also stated that if either party failed to sign the MSA, the memorandum "shall be enforceable as a Judgment under Code of Civil

3

Procedure § 664.6." The parties exchanged preliminary declarations of disclosure of their assets and liabilities.

On March 23, 2009, Tom filed a petition for dissolution of marriage to Julie. Negotiations continued on finalizing the MSA terms and counsel exchanged drafts and communications. As of July 2009, they were still debating the tax status of the $40,000 payment from Tom, but the attorneys believed that the deal was done. After the separation, Tom told his brother (one of the trustees) that "it's all over." He told Lange that Julie and he were incompatible.

Back in December 2004, when Tom was divorced from Lange, he executed the pour-over will disinheriting her and amended the trust to exclude her from benefiting from it. On April 10, 2009, Tom wrote on a copy of that will, "getting divorced from Julie," and wrote in the name of Julie to replace Lange's name as the spouse to be excluded from inheriting, and he initialed it and had it witnessed. At trial, the probate court determined it was not an enforceable codicil to the will.

At some other point, Tom got a copy of the trust from his estate planning attorney, and he wrote on the trust copy to identify Julie (not Lange) as his wife and to nominate her as a successor trustee. Julie did not seek to replace the trustees, since Tom's attorneys told her that copy of the trust was not complete.

The original 2004 will and trust documents were unavailable at the time of trial and it appeared that they had been lost in a burglary of Tom's safe. The trustees found copies of estate planning documents after Tom's death. Copies of the will and trust were produced at trial.

4

On August 16, 2009, Tom killed himself. Julie helped get the death certificates and told Tom's brother that she did not want anything more than she had received, except for a few of Tom's personal possessions. The petition for dissolution was still pending, and the MSA was never finalized.

## B. Litigation

The trustees requested that Julie sign a waiver of rights regarding the trust, and in response, she retained counsel. In October 2010, Julie filed a petition for an order declaring she should share in Tom's estate as an omitted spouse pursuant to section 21600 et seq. (§§ 17200, subds. (b)(4), (7); 850, subd. (a)(3).) The trustees answered, alleging that Tom had clearly shown his intent to provide for Julie outside the Trust, and she had effectively waived any inheritance rights. Julie brought a motion for summary judgment, which the trustees opposed, and they provided a declaration from Tom's family law attorney, Ms. Sickler. The motion was denied.

The probate court bifurcated trial, to determine first whether Julie had standing to object to the trustees' accounting as an omitted spouse. The court heard the testimony of numerous witnesses and admitted into evidence numerous documents on those issues (described as necessary in the discussion portion of this opinion).

In the court's statement of decision, the court set forth extensive background information and ruled, in relevant part, on the contentions of the parties as follows. The $40,000 and $7,500-plus payments made by Tom to Julie amounted to an in lieu transfer to her in place of any inheritance rights, within the meaning of section 21611, subdivision (b). The court relied, inter alia, on testimony about statements Tom had made to his

5

family law attorney, Ms. Sickler, his brother (trustee Dixson), and his ex-wife Lange. Tom apparently believed and intended that those two payments, made in anticipation of dissolution, would finally resolve all property rights between the parties, such as inheritance rights.

The court determined that the memorandum of settlement was a binding written agreement between Tom and Julie, entered into in anticipation of dissolution of the marriage and completely settling their property disputes and relationships. The court ruled that Julie had waived her right to inherit from Tom. Even though the MSA was never completed, the evidence showed that the parties intended the memorandum to amount to a binding, full and complete settlement of their property issues, made in anticipation of dissolution, and operating to waive Julie's right to inherit as a surviving spouse.

Moreover, the probate court found that Tom had provided a preliminary declaration of disclosure of assets and liabilities, and that Julie was knowledgeable about his financial status from the outset of the marriage. The court thus ruled that she had waived any further requirement of disclosure of his assets and liabilities, she remained bound by the memorandum, and the finalization of the MSA was not essential to the agreement.

In response to Julie's argument at trial that Tom had violated his fiduciary duties to her under Family Code section 721, subdivision (b), the court found that Probate Code sections 143 and 144 separately provided that such a Family Code provision was not applicable, when the alternative Probate Code criteria for enforceability of a waiver of

6

inheritance rights were satisfied. The court next ruled that the Probate Code requirements of sections 143 and 144 had been satisfied, and Julie's waiver was enforceable. Thus, both subdivisions (b) and (c) of section 21611 had been proven to apply, and they provided exceptions to any inheritance rights of a surviving spouse. The trial court denied Julie's petition. The trustees filed an amended accounting and request for compensation and attorney fees, which the trial court approved.

Julie timely filed a notice of appeal of the order denying her standing to object, and also filed a notice of appeal of the subsequent order settling the amended account.[2]

DISCUSSION

In the initial phase of the bifurcated proceedings, the probate court issued a statement of decision determining that Julie had no standing as a pretermitted spouse to contest the account of the trustees. This statement of decision included findings on all those initial, material controverted issues. On appeal, Julie challenges the resulting orders by contending that no sufficient evidence supports them, regarding: (A) whether she, as a surviving spouse, retained inheritance rights under section 78 et seq.; (B) whether the payments to her in connection with the deed amounted to a transfer by Tom to her, in lieu of his estate plan, within the meaning of section 21611, subdivision (b); and (C) whether she had effectively waived her inheritance rights within the meaning of section 140 et seq., and section 21611, subdivision (c).

---

2    As part of the record in this case, Julie designated the lodged exhibits and the declaration of Ms. Sickler that were filed in connection with her motion for summary judgment. As explained in part I.C, *post*, she also requested judicial notice and additional orders about those filings, which we granted in part and denied in part.

7

We first outline applicable legal principles and then address these arguments in sequence.

I

*APPLICABLE STANDARDS*

A. Statement of Decision; Review

Julie initially argued in her opening brief for a de novo standard of review, based upon her views on statutory and documentary interpretations. In her reply brief, she seeks to have us apply a standard for mixed questions of law and fact. At trial, the parties disputed the intent of both Tom and Julie in entering into the various settlement documents and discussions. The probate court's statement of decision was issued after the court heard testimony and reviewed documents to resolve the issues identified in the trial briefs.

Because the key trust interpretation issues here were decided on such a record of conflicting evidence, and by means of a statement of decision, "any conflict in the evidence or reasonable inferences to be drawn from the facts will be resolved in support of the determination of the trial court decision." (*In re Marriage of Hoffmeister* (1987) 191 Cal.App.3d 351, 358; Eisenberg, et al., Cal. Practice Guide: Civil Appeals and Writs (The Rutter Group 2012) ¶ 8:62, pp. 8-28 to 8-29; § 1000 [Code Civ. Proc. rules of practice apply in probate proceedings].) The ultimate facts found in the court's statement of decision necessarily include findings on the intermediate evidentiary facts that sustain them. (*Muzquiz v. City of Emeryville* (2000) 79 Cal.App.4th 1106, 1125 (*Muzquiz*).)

Generally, "[w]hen the trial court has resolved a disputed factual issue, the appellate courts review the ruling according to the substantial evidence rule. If the trial court's resolution of the factual issue is supported by substantial evidence, it must be affirmed." (*Winograd v. American Broadcasting Co.* (1998) 68 Cal.App.4th 624, 632.) The substantial evidence standard of review involves two steps. "First, one must resolve all explicit conflicts in the evidence in favor of the respondent and presume in favor of the judgment all *reasonable* inferences. [Citation.] Second, one must determine whether the evidence thus marshaled is substantial. While it is commonly stated that our 'power' begins and ends with a determination that there is substantial evidence [citation], this does not mean we must blindly seize any evidence in support of the respondent in order to affirm the judgment. . . . [Citation.] '[I]f the word "substantial" [is to mean] anything at all, it clearly implies that such evidence must be of ponderable legal significance. Obviously the word cannot be deemed synonymous with "any" evidence. It must be reasonable . . . , credible, and of solid value . . . .' [Citation.] The ultimate determination is whether a *reasonable* trier of fact could have found for the respondent based on the *whole* record." (*Kuhn v. Department of General Services* (1994) 22 Cal.App.4th 1627, 1632-1633, fns. omitted.)

"[T]he power of an appellate court *begins* and *ends* with the determination as to whether, *on the entire record*, there is substantial evidence, contradicted or uncontradicted, which will support the determination, and when two or more inferences can reasonably be deduced from the facts, a reviewing court is without power to substitute its deductions for those of the trial court. *If such substantial evidence be found,*

9

*it is of no consequence that the trial court believing other evidence, or drawing other reasonable inferences, might have reached a contrary conclusion.*" (*Bowers v. Bernards* (1984) 150 Cal.App.3d 870, 873-874.) We may not reweigh the evidence and are bound by the trial court's credibility determinations. (*Ibid.*; see *Heller v. Pillsbury Madison & Sutro* (1996) 50 Cal.App.4th 1367, 1384.)

B. Extrinsic Evidence; Review

To the extent the probate court was required to interpret documents containing ambiguous language, a de novo standard of review applies to the threshold determination of the ambiguity of their provisions. (*Winet v. Price* (1992) 4 Cal.App.4th 1159, 1165-1166 (*Winet*).) The probate court correctly determined that these settlement and testamentary documents were ambiguous on the status of Julie as a surviving spouse with regard to inheritance matters, so the probate court appropriately considered the extrinsic evidence offered. (*Ibid.*)

When required to consider extrinsic evidence as a means of clarifying an ambiguous provision, the courts will follow accepted guidelines:

> "The decision whether to admit parol evidence involves a two-step process. First, the court provisionally receives (without actually admitting) all credible evidence concerning the parties' intentions to determine 'ambiguity,' i.e., whether the language is 'reasonably susceptible' to the interpretation urged by a party. If in light of the extrinsic evidence the court decides the language is 'reasonably susceptible' to the interpretation urged, the extrinsic evidence is then admitted to aid in the second step--interpreting the contract. [Citation.]" (*Winet, supra,* 4 Cal.App.4th at p. 1165.)

Based on the conflicting evidence presented about the respective intentions of the parties, the probate court interpreted the memorandum, and determined that the meaning

10

urged by the trustees was the most reasonable and appropriate. The court declined to rely on the MSA as an enforceable document, since it was not executed, but nevertheless considered the evidence about the negotiations and drafting efforts for the MSA. These constructions of the documents by the trial court will be upheld on appeal, so long as they are reasonable and supported by substantial evidence. (*Winet, supra,* 4 Cal.App.4th 1159, 1166.) This is not a case in which no parol evidence was introduced or there was no conflict, such that this appellate court could or must independently construe the writings. (*Id.* at pp. 1165-1166.)

## C. Status of Record on Appeal

Julie brought a request for judicial notice on appeal, and for an order confirming certain documents are part of this record. (Evid. Code, § 459.) The subject documents are the petition for dissolution filed by Tom, and an opposing declaration filed in connection with Julie's motion for summary judgment, giving the views of Tom's family law attorney, Sickler. In those summary judgment proceedings, the trial court took judicial notice of the petition for dissolution, and denied the motion.

On appeal, the trustees opposed Julie's motions to supplement the record, contending that neither of the documents she identified had been admitted as an exhibit at trial, although there was some general discussion at trial about the dissolution petition, and it was not disputed that Tom had filed one and when.

On February 15, 2013, this court ruled upon the motion, granting it insofar as judicial notice of the documents' filing was concerned, but denying the motion for an order to confirm the documents are part of the record on appeal. In any case, we adhere

11

to the rule that judicial notice properly extends to the existence of the documents, but not to the truth of the allegations contained in them.  (*Wolf v. CDS Devco* (2010) 185 Cal.App.4th 903, 915.)

Further, Julie's second notice of appeal has challenged the final order settling the accounting and report of the trustees.  Substantial evidence review standards apply to appellate examination of a probate court's decision to accept an accounting, and Julie, as appellant, has the burden of showing error.  (*Estate of Bonaccorsi* (1999) 69 Cal.App.4th 462, 471; *Estate of Massaglia* (1974) 38 Cal.App.3d 767, 774-778.)  "[I]in the absence of a challenge to findings it is assumed that they are supported by the evidence and that they support the judgment. "  (*Id.* at p. 778.)  Mainly, Julie is challenging the initial order in the bifurcated proceedings that determined she had no standing as a pretermitted spouse to contest the account of the trustees, and we next address that dispositive issue.

II

*SUBSTANTIVE LAW:  SECTION 21600 ET SEQ., REGARDING OMITTED SPOUSES*

Section 21600 states that "[t]his part shall apply to property passing by will through a decedent's estate or by a trust . . . that becomes irrevocable only on the death of the settlor."  Section 21610 provides for omitted spouses to share in a decedent's estate under certain circumstances, stating:

> "*Except as provided in Section 21611*, if a decedent fails to provide in a testamentary instrument for the decedent's surviving spouse who married the decedent after the execution of all of the decedent's testamentary instruments, the omitted spouse shall receive a share in the decedent's estate, consisting of the following property in said estate: [¶] (a)  The one-half of the community property that belongs to the decedent . . .   [¶] (b)  The one-half of the quasi-community property that belongs to the decedent . . .   [¶] (c)  A share of the

12

separate property of the decedent equal in value to that which the spouse would have received if the decedent had died without having executed a testamentary instrument . . . ."  (Italics added.)

Julie argues the evidence is insufficient to support the trial court's finding that section 21611 applied in this case, to provide one or more exceptions to the omitted spouse provisions of section 21610.  Under section 21611:[3]

> "The spouse shall not receive a share of the estate under Section 21610 if any of the following is established:  [¶] . . . [¶] (b) The decedent *provided for the spouse by transfer outside of the estate* passing by the decedent's testamentary instruments and *the intention that the transfer be in lieu of a provision in said instruments is shown by statements of the decedent* or from the amount of the transfer *or by other evidence*.  [¶] (c) The spouse made a valid agreement waiving the right to share in the decedent's estate."  (Italics added.)

## III

## *CONTENTIONS AND ANALYSIS*

### A.  Surviving Spouse Status

Under section 78, subdivision (d), a " 'surviving spouse' for purposes of the Probate Code does not include '[a] person who was a party to a valid proceeding concluded by an order purporting to terminate all marital property rights.' "  (*In re Estate of McDaniel* (2008) 161 Cal.App.4th 458, 461 (*McDaniel*).)  In the Law Revision Commission Comment to section 78, the reader is referred to sections 140 through 147, regarding a surviving spouse's waiver of rights at death.  (Cal. Law Revision Com. com.,

---

[3]    Section 21611, subdivision (a) additionally provides for no spousal inheritance rights if "[t]he decedent's failure to provide for the spouse in the decedent's testamentary instruments was intentional and that intention appears from the testamentary instruments."  This was not proven, due to lost originals of Tom's will and trust, and the trial court's conclusion on that portion of the dispute is not challenged here.

52 West's Ann. Prob. Code (2002 ed.) foll. § 78, p. 74.) The trustees do not deny that Julie was still married to Tom when he died, or that his dissolution petition was not finally adjudicated, but they contend that she cannot rely on the pure language of this section, due to the contractual interactions between the parties, even though there was never any dissolution or legal separation judgment.

In a more common fact pattern, in *McDaniel, supra*, 161 Cal.App.4th 458, the parties entered into a judgment dividing their marital property and they waived any rights to appeal. That judgment became final before the husband died, even though their marital status had not yet been terminated. Thus, the wife was prevented from inheriting from his estate, due to the operation of the judgment, which precluded her status as a surviving spouse who could inherit. The property settlement judgment reached before his death made her into "a party to a valid proceeding concluded by an order purporting to terminate all marital property rights" within the meaning of section 78, subdivision (d). (*McDaniel, supra,* at p. 462; see *Estate of Lahey* (1999) 76 Cal.App.4th 1056 [a legal separation judgment amounted to an order for termination of marital property rights, under section 78, subdivision (d)].)

This trial involved the presentation of extrinsic evidence and testimony from Tom's family law attorney Sickler, his ex-wife Lange, his brother and other witnesses, about the terms and scope of the contractual settlement, as it was represented in the memorandum. Julie and her family law attorney Anderson also presented evidence going toward the appropriate purpose of illuminating all the circumstances under which the documents, including the memorandum, were created. (See *Wells Fargo Bank v.*

14

*Marshall* (1993) 20 Cal.App.4th 447, 453.) The memorandum provided that Julie waived "any and all rights she may have to receive" spousal support, community property interests, or any of Tom's retirement assets, and allowed for enforcement under Code of Civil Procedure section 664.6. The probate court determined that the memorandum was proven to be a binding contract between the parties, even though no MSA was completed. The court had to decide the scope of the settlement and the property rights covered, according to the evidence, and it determined that its scope was broad and Julie's inheritance rights were waived.

Although the court did not have the dissolution petition before it as an exhibit, it was not disputed that Tom had filed one. Julie seeks to support her surviving spouse status by citing to evidence suggesting that she hoped there would be a reconciliation and the marriage would not eventually be terminated, and that she had received the $40,000 and debt forgiveness as support, not as a final payment, because she did not have a place to live when they separated. She also points out that she was self-supporting and knowledgeable about Tom's financial circumstances when they married, and thus she did not marry him for his money and should not be viewed as a gold digger, but nevertheless, she claims the assets he disclosed in April 2009 were greater than she expected. However, she does not deny that she received timely disclosures of his assets and liabilities, pursuant to the memorandum obligations, and she accepted the payments as negotiated, and they were made in anticipation of dissolution. That the dissolution petition remained pending and could have resulted in a different property allocation is not dispositive, because the parties did not pursue the petition, and it can be inferred that

15

neither of them believed that it was necessary to do so, in view of the agreement they had reached.

Moreover, when Julie points out portions of the evidence that might support her view of things, that is not equivalent to demonstrating that there was no substantial evidence in support of the trial court's conclusions that she did not qualify as a surviving spouse for inheritance purposes. Instead, the extrinsic evidence showed there were settlement negotiations about many different kinds of property rights, culminating in the terms of an enforceable memorandum of agreement covering termination of all the usual marital property rights, and Tom understood that this would include inheritance rights, and did not hide his understanding from Julie. He sent her an e-mail on March 18, 2009, telling her that with respect to signing the quitclaim deed, she had "taken a simple bank formality and made it into a total divorce settlement."

As we interpret section 78, subdivision (d), it is not dispositive here that the memorandum was contractual in nature, rather than a court filed "valid proceeding concluded by an order purporting to terminate all marital property rights." (*Ibid*.) The memorandum anticipated enforceability as a judgment under Code of Civil Procedure section 664.6. In the current litigation, Julie was provided with an adequate opportunity to attempt to prove that as a matter of law, she qualified as a surviving spouse in this trust matter, as defined by statute. She was unable to do so, and the current orders confirm the parties' previous contractual arrangements and serve to establish the termination of her marital property rights, including inheritance. It would have been premature for the probate court to cut off the inquiry as a simple matter of definition under section 78,

16

without considering the otherwise applicable provisions of section 21610 et seq., together with sections 140 et seq.

Under all the circumstances shown at trial, it was not enough for Julie to rely on section 78, subdivision (d), or to argue that neither the dissolution judgment nor MSA was ever finalized. Instead, the court properly proceeded to determine whether the statutory criteria of section 21611, subdivisions (b) or (c) were satisfied, such that the memorandum was intended by the parties to accomplish a final adjudication of their respective property rights, including a waiver of inheritance.

### B. Transfer In Lieu of Estate Plan

Julie next argues there was no substantial evidence supporting a finding that under section 21611, subdivision (b), her circumstances fell within an exception to section 21610's omitted spouse provisions. Specifically, the probate court found that Tom had provided for Julie by transfers outside the trust and that he had intended those transfers to be in lieu of providing for her under the trust. (§ 21611, subd. (b).) It is a different question whether Julie intentionally waived her inheritance rights, as we shall discuss in part III.C, *post*.

Julie claims that not all of the criteria of sections 140 through 147 were met here, regarding the regulation of contractual arrangements about rights at death, which must be in writing. (§ 142.) The purposes of these enactments are to provide standards of enforceability of property settlements (usually prenuptial) that are intended to act as a waiver of inheritance rights. (*Estate of Gibson* (1990) 219 Cal.App.3d 1486, 1492.) The Legislature sought in these sections to ensure that the circumstances of such a waiver of

17

rights would be subject to evaluation by a court to determine enforceability. (*Id.* at p. 1493.)

Under section 145, these standards regulating contractual dispositions of rights at death also apply to a "written agreement" or a "property settlement" that was " 'entered into after or in anticipation of separation or dissolution or annulment of marriage.' " (*Estate of Gibson, supra*, 219 Cal.App.3d 1486, 1492.) "Probate Code section 145 thus appears to be directed at two types of situations: (1) where the parties do not intend an agreement to be merged into a dissolution judgment; and (2) where one party dies after both have executed a marital settlement agreement but before the court has heard the matter for the purpose of rendering a judgment incorporating the agreement." (*Gibson, supra,* at p. 1492.) This section provides that a waiver of "all rights" or equivalent language in the property or estate of a spouse is deemed to include, absent contrary language, a waiver of rights listed in section 141, subdivision (a), which includes inheritance rights.

An enforceable waiver of inheritance rights must comply with the requirements of sections 143 or 144 (setting the criteria for enforceability of a waiver, e.g., adequate disclosure being made of assets if disclosure was not waived, representation by counsel, or possession of independent knowledge about such assets). (§§ 142, subd. (b); 143, subd. (a)(1).) No such issues are argued on appeal about whether at the time of signing, the decedent had violated any fiduciary duty to the spouse. (§ 144, subd. (a)(2); *In re Estate of Will* (2009) 170 Cal.App.4th 902, 908; Fam. Code, § 721.)

Here, the memorandum of settlement is written, was signed by Julie, and it shows compliance with the requirements of section 143 and 144 regarding his disclosures and her knowledge of assets. The lack of a subsequently signed MSA does not make any difference, because the extrinsic evidence about the circumstances under which this memorandum was signed by both spouses, while represented by counsel, shows that it was done in anticipation of dissolution, mentions "any and all rights she may have to receive" different kinds of known property rights, expressly including spousal support, community property, or retirement assets. Under all the relevant circumstances, this is a complete enough list to satisfy the requirements of sections 143 through 145, and we can find no requirement that inheritance rights must be more specifically mentioned in any other type of writing, in order for an enforceable waiver to occur.

Further, Julie cannot claim any entitlement to a different type of writing, in addition to the memorandum, on the basis that she and Tom did not exchange their financial information until after the memorandum was signed, rather than before it. She waived any right to demand an additional writing following up on such disclosures, by agreeing that the disclosure could take place within 30 days of signing of the memorandum. She also admitted that she knew and understood Tom's financial condition during the marriage, and that after separation, she received disclosures as agreed.

The court's findings of Tom's in lieu transfer are well supported by the testimony regarding the purpose of the transfers and the context in which they were made. First, Tom told Julie he had made the transfers outside the Trust because she made it clear to

19

him that she wanted to accomplish a complete property settlement. That these transfers were to be in lieu of providing for her under the trust is also shown by the testimony from Tom's attorney, Sickler, that she and Julie's attorney, Anderson, agreed that the boilerplate provisions from "certified specialist" documents, about waiver of inheritance rights, would be included in the MSA, and neither Tom nor Julie expressed any opposition to that. In the opinion of Attorney Sickler, the $40,000-plus payment to Julie was more than reasonable for a nine-month marriage, as an equalizing payment.

According to Tom's ex-wife Lange, he told her that his divorce from Julie was final and that once he paid Julie the money, he assumed the dissolution matters were concluded. Tom's intention to exclude Julie from his estate plan was also shown in the handwritten additions he made to his copy of the will. The probate court had a reasonable basis in the evidence to conclude that the payments were made and accepted in lieu of provisions for Julie under the trust. (§ 21611, subd. (b).) Substantial evidence was provided to support a reasonable inference that Tom had the intention his transfers to Julie in connection with the dissolution, outside the trust, would prevent Julie from sharing in the Trust's assets. (*Ibid*.)

## C. Waiver

Under section 21611, subdivision (c), a spouse shall not receive a share of the decedent spouse's estate under section 21610, if she has made a valid agreement waiving that right. This section is read together with the requirements of sections 143 through 145, controlling the enforceability of a contractual waiver of inheritance rights (such as

20

the making of adequate disclosures, representation by counsel, or independent knowledge of the financial standing of the decedent).

To the extent that the probate court determined that the memorandum included inheritance rights, even though it did not expressly list them, the court's conclusions were legitimately based on express and implied findings that the memorandum language was ambiguous, that extrinsic evidence was essential to resolve those issues, and that such evidence supported a finding that the memorandum was intended to be a final settlement of the parties' respective property rights, in anticipation of dissolution, and it would terminate all of their responsibilities to each other. (§ 145; *Estate of Gibson*, *supra*, 219 Cal.App.3d at p. 1492; *McDaniel, supra*, 161 Cal.App.4th at p. 462; see *Muzquiz*, *supra*, 79 Cal.App.4th 1106, 1125.) The attorneys for the parties who were drafting the documents testified they had reached that understanding, and nothing they heard from their clients contradicted it, so they thought that the deal was complete. Julie cannot now contend that any additional writings were required, pursuant to section 142, once Tom had changed his position by paying the money to her and forgiving the credit card debt, under the demonstrated understanding that these were equalizing payments.

Without reweighing the evidence, and accepting the substantial evidence in the record, "contradicted or uncontradicted, which will support the determination, and when two or more inferences can reasonably be deduced from the facts," this reviewing court is entitled to accept the trial court's resolution of the disputed factual and legal issues. (*Bowers v. Bernards*, *supra*, 150 Cal.App.3d at pp. 873-874.) Julie has not shown how or why the trial court's conclusions that she waived her inheritance rights in return for other,

21

in lieu compensation are lacking in any substantial evidence support.  (*Winograd v. American Broadcasting Co.*, *supra*, 68 Cal.App.4th at p. 632.)

DISPOSITION

The orders are affirmed.  Costs on appeal are awarded to Respondents.

HUFFMAN, J.

WE CONCUR:


McCONNELL, P. J.


HALLER, J.